**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DON WILLIAMS d/b/a URTHCOM, LLC <br><br> Plaintiff, <br><br> v. <br><br> SOLID CONTACT BASEBALL, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | CASE NO.    08cv2839    JH <br> JUDGE HOLDERMAN <br> MAGISTRATE JUDGE ASHMAN |
| SOLID CONTACT BASEBALL, INC., <br><br> Counter-Plaintiff, <br><br> v. <br><br> DON WILLIAMS, <br><br> Counter-Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| SOLID CONTACT BASEBALL, INC., <br><br> Third Party Plaintiff, <br><br> v. <br><br> URTHCOM, LLC; PETER CEKO; AND CEKOM CORP; <br><br> Third Party Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | |

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM**

Defendant, SOLID CONTACT BASEBALL, INC. ("SCB"), by and through its attorneys, for its First Amended Answer, Affirmative Defenses and Counterclaim to Plaintiff Don Williams d/b/a UrthCom, LLC's ("Plaintiff's") Complaint, states as follows:

**NATURE OF ACTION**

1.      This is an action for breach of contract, wherein URTHCOM seeks damages for SCB's refusal to pay amounts due and owing under a contract concerning the production of a thirty minute infomercial, a two minute commercial, a one minute commercial and an

1

instructional digital video disc, all staring [*sic*] baseball legend Rod Carew, as well as the creation of a marketing internet website. SCB used the products provided by URTHCOM for its benefit and profit and advised that the products provided by URTHCOM were "overall from everybody, A+" work that "really looks great." Thereafter, SCB refused to pay the balance due under the contract.

**ANSWER:**     SCB admits that this purports to be an action for breach of contract, but denies that Plaintiff's Complaint properly states a claim for breach of contract or any other cause of action, and SCB otherwise denies all allegations of Paragraph 1.

## PARTIES

2.     Plaintiff DON WILLIAMS d/b/a URTHCOM, LLC, is a citizen of the State of Illinois.

**ANSWER:**     SCB lacks knowledge and information sufficient to form a belief about the truth of the allegations of Paragraph 2.

3.     Defendant SCB is a corporation organized under the laws of the State of Connecticut and maintains its principal place of business in Connecticut.

**ANSWER:**     SCB admits that its principal place of business is in the State of Connecticut, but denies all remaining allegations of Paragraph 3.

## JURISDICTION AND VENUE

4.     Jurisdiction is proper in this Court, pursuant to 28 U.S.C. §1332(a), because the plaintiff and defendant are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

**ANSWER:**     SCB admits that the Complaint purports to state a claim for damages in an amount greater than $75,000, but denies that Plaintiff has properly stated a claim for relief in any amount.  SCB lacks knowledge and information as to Plaintiff's state of citizenship sufficient to form a belief about the truth of the remaining allegations of Paragraph 4.

5.     The Court has specific personal jurisdiction over the Defendant in this matter because it transacted business in the State of Illinois when it entered into the contract that is the subject matter of this suit and partially performed the contract that is substantially connected to the State of Illinois because it required performance in Chicago, Illinois. Defendant also otherwise does business in the State of Illinois.

**ANSWER:**    SCB admits that it does business in the State of Illinois and submits to the personal jurisdiction of this Court.  SCB denies the remaining allegations of Paragraph 5.

6.    Venue is proper in this District, pursuant to 28 U.S.C. §1391(a)(2), because a substantial part of the events or omissions giving rise to URTHCOM's claims occurred in this District and because the contract required performance in Chicago, Illinois which is in this District.

**ANSWER:**    Paragraph 6 contains legal conclusions which require no response.  To the extent that a response is required, SCB denies the allegations of Paragraph 6.

## THE CONTRACT

7.    On September 5, 2007, URTHCOM and SCB entered into a written contract for the "Agency Services" calling for URTHCOM to produce, among other things, a thirty (30) minute infomercial, a two minute commercial, a one minute commercial, an instructional digital video disc and a marketing internet website (the "Contract"). A true and correct copy of the Contract is attached hereto as Exhibit A and incorporated herein by reference.

**ANSWER:**    SCB admits that in September, 2007, it executed a written document purporting to be a contract between SCB and an entity holding itself out as "UrthCom, LLC." SCB further admits that Exhibit A to the Complaint represents a true and correct copy of said document.  Exhibit A speaks for itself.  SCB denies Plaintiff's characterization of that document, as well as all remaining allegations of Paragraph 7.

8.    The contract called for two base payments, $67,500 due upon signature and $67,500 due on November 1, 2007.

**ANSWER:**    SCB states that Exhibit A speaks for itself, and denies all remaining allegations of Paragraph 8.

9.    SCB made the first $67,500 payment but failed to make the payment due on November 1, 2007.

**ANSWER:**    SCB admits that it made a payment in the amount of $67,150 to a numbered account provided to SCB by Plaintiff's agent/employee Stephanie Rice (now known as Stephanie Wysocki), who purported to be providing the account number of "Xtra Strength,"

which is, on information and belief, a business alias used by Williams prior to adopting "UrthCom, LLC." In fact, the account was controlled by Peter Ceko through his corporate alter ego Cekom Corporation. SCB denies that any additional monetary amount was or is due or owing to Plaintiff or "UrthCom, LLC," and further denies all remaining allegations of Paragraph 9.

10. The contract also called for SCB to pay URTHCOM "MARK-UPS AND OUT-OF-POCKET EXPENSES" subject to a handling charge of 15% for such items, travel costs, and change fees ("Additional Items").

**ANSWER:** Exhibit A speaks for itself. SCB denies the remaining allegations of Paragraph 10 and specifically denies that any monetary amount is due or owing to Plaintiff.

11. To date, URTHCOM has invoiced SCB $24,702.23 for Additional items under the Contract.

**ANSWER:** SCB denies that it has ever received an invoice in the amount of $24,702.23 from the entity holding itself out as "UrthCom, LLC," and further denies all remaining allegations of Paragraph 11.

12. The Contract required performance to be completed on or before November 1, 2007, but performance was delayed because SCB failed to provide legal copy, product price points, and final offer information as required by the Contract.

**ANSWER:** Exhibit A speaks for itself. SCB denies the remaining allegations of Paragraph 12.

13. On October 31, 2007, SCB advised that it wanted to add additional testimonials from Bobby Valentine Sports Academy to the previously produced infomercial and commercials thereby delaying delivery of the final versions of the infomercial and commercials.

**ANSWER:** SCB admits that it desired to add further testimonials to the infomercial and commercials contemplated by Exhibit A. SCB denies that Plaintiff successfully completed this work. SCB further denies all remaining allegations of Paragraph 13.

14. The Contract also required SCB to indemnify URTHCOM for any materials or images provided for use in the infomercial or commercials.

**ANSWER:**    Exhibit A speaks for itself.  SCB denies the remaining allegations of Paragraph 14.

15.    SCB had previously provided Major League Baseball footage of Rod Carew to URTHCOM for use in the infomercial and commercial.

**ANSWER:**    SCB admits that it provided footage of Rod Carew to the entity holding itself out as UrthCom, LLC, for use in connection with the infomercials and commercials contemplated by Exhibit A.

16.    Upon investigation, URTHCOM learned that SCB did not obtain approval from Major League Baseball to use the footage. Thus, the project was further delayed based on SCB's failure to comply with the Contract.

**ANSWER:**    Denied.

17.    On or about January 7, 2008, URTHCOM received feedback and suggested changes from SCB legal for the first time.

**ANSWER:**    Denied.

18.    On or about January 15, 2008, URTHCOM received revised legal feedback regarding legal disclaimers.

**ANSWER:**    Denied.

19.    On or about January 29, 2008, SCB approved the final version of the infomercial and two commercials.

**ANSWER:**    Denied.

20.    On or about February 1, 2008, URTHCOM delivered the Instructional DVD described in the Contract to SCB and SCB accepted the Instructional DVD.

**ANSWER:**    Denied.

21.    On or about January 7, 2008, SCB advised that it wished to test the infomercial and commercials on its own ("Media Schedule").

**ANSWER:**    SCB admits that due to the relatively high rates quoted, and lack of experience of the media team selected, by the entity holding itself out as "UrthCom, LLC," SCB advised "UrthCom, LLC" that SCB would conduct media testing on its own.

22.    After SCB advised that it did not want URTHCOM to perform under the Media Schedule portion of the Contract, URTHCOM credited SCB $13,400 for this item leaving a balance due of $78,802.23.

**ANSWER:**    Denied.

## COUNT I
## BREACH OF CONTRACT

23.    Plaintiff incorporates by reference Paragraphs 1 through 22 above as if set forth here in full.

**ANSWER:**    SCB restates and realleges its responses to Paragraphs 1 through 22 of the Complaint and incorporates them in response to the allegations contained in Paragraph 23.

24.    URTHCOM has performed all required under the Contract except the Media Schedule and performance of that item has been excused.

**ANSWER:**    Denied.

25.    SCB accepted the infomercial, commercials, digital video disc and website and used the materials for profit.

**ANSWER:**    Denied.

26.    SCB admitted that the products provided by URTHCOM were "overall from everybody, A+" work that "really looks great."

**ANSWER:**    SCB admits that the statements quoted in Paragraph 26 were made in reaction to early materials provided to SCB by "UrthCom, LLC." But SCB denies all remaining allegations of Paragraph 26 and specifically denies that the final versions of any products provided by Plaintiff or "UrthCom, LLC" were acceptable or approved by SCB.

27.    Despite repeated demands for payment, SCB refuses to pay URTHCOM the balance due under the Contract.

**ANSWER:**    Denied.

28.    As a result of SCB's Breach of the Contract URTHCOM has been damaged in the amount of $78,802.23 plus interest and attorneys fees and all costs and expenses incurred in this suit pursuant to the Contract which provides that in any litigation where a party seeks to enforce its rights under the Contract the prevailing party shall be awarded its reasonable attorney fees, and costs and expenses incurred.

**ANSWER:**    Denied.

WHEREFORE, Defendant, SOLID CONTACT BASEBALL, INC. denies that Plaintiff is entitled to any relief whatsoever.

### SCB'S AFFIRMATIVE DEFENSES

SCB alleges and asserts the following defenses in response to the allegations contained in Plaintiff's Complaint, and SCB specifically reserves the right to assert additional defenses that become known through the course of discovery.

1.    The Complaint fails to state a claim upon which relief can be granted.

2.    Plaintiff is barred from obtaining any of the relief it seeks in the Complaint in whole or in part because he has brought this suit in bad faith, having failed to complete the work in a commercially reasonable manner, and has unclean hands by reason of his misrepresentations of the nature, status and history of "UrthCom, LLC."

3.    Plaintiff's claims are barred and should be dismissed because no valid contract exists.  At the time of formation of the purported contract at issue in this matter, the organization purporting to enter into the contract—UrthCom, LLC—was not yet in existence and incapable of entering into a contract, as a matter of law.

4.    Plaintiff's claims are barred and should be dismissed because the contract at issue in this matter is unconscionable and unenforceable.  SCB was fraudulently induced to enter into the purported contract at issue by Plaintiff's false representations, as alleged in SCB's Counterclaim filed with this Answer.

5.    Plaintiff's claims are barred and should be dismissed because of the failure of consideration on Plaintiff's part to earn the amounts alleged in the Complaint.

6.      Plaintiff's claims are barred and should be dismissed because to the extent a valid contract exists between the parties, Plaintiff has materially breached that contract by not fulfilling his obligations, thereby discharging SCB's obligations under the agreement.

7.      By virtue of the facts alleged in SCB's Counterclaim filed with this Answer, SCB is entitled to set off its damages for Plaintiff's wrongdoing against any and all recovery to which Plaintiff may otherwise be entitled.

### SCB'S PRAYER FOR RELIEF AS TO PLAINTIFF'S COMPLAINT

WHEREFORE, Defendant, SOLID CONTACT BASEBALL, INC. denies that Plaintiff is entitled to any relief whatsoever, and prays for entry of judgment against Plaintiff Don Williams d/b/a UrthCom, LLC as follows.

1.      Dismissing with prejudice and on the merits Plaintiff's purported Complaint in its entirety;

2.      Awarding SCB its costs and attorney's fees as permitted by law;

3.      Awarding SCB such other and further relief as the Court may deem just and equitable.

### COUNTERCLAIM

For its Counterclaim against Donald Williams, SCB states as follows:

### Nature of the Case

1.      This is an action for (1) breach of contract; (2) fraud in the inducement; (3) violations of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.*; and (4) civil conspiracy.

2.      Plaintiff/Counter-Defendant Don Williams has, alone or in concert with his alter ego, Third Party Defendant UrthCom, LLC ("UrthCom"), breached an agreement with SCB to provide certain marketing services.   Williams/UrthCom collected SCB's money and then

delivered in return an "infomercial" for SCB's GAP Hitter product with content and formatting deficiencies so serious as to be completely useless for broadcast.

3.      In addition, Williams, alone or in concert with Third Party Defendants UrthCom, Peter Ceko ("Ceko"), and Cekom Corporation ("Cekom"), has acted to deceive and commit fraud against SCB by knowingly and intentionally misrepresenting the qualifications, experience and abilities of Williams and/or UrthCom; by intentionally failing to disclose the financial interest of Ceko in and to the business operations of Williams and UrthCom; and by committing various other deceptive and unfair acts in violation of law.

### Jurisdiction and Venue

4.      This Court has subject matter jurisdiction over this Counterclaim under 28 U.S.C. § 1332(a)(1).  Williams is a citizen of a different state than SCB, and the amount in controversy exceeds $75,000, exclusive of interest and costs.  Personal jurisdiction and venue are proper as a result of Williams having availed himself of the jurisdiction of this Court to sue SCB, and furthermore Williams is a citizen of the State of Illinois residing in this judicial district.

### The Parties

5.      Defendant/Counter-Plaintiff Solid Contact Baseball, Inc. ("SCB") is a corporation organized under the laws of the State of Delaware with its principal place of business in Connecticut.

6.      On information and belief, Plaintiff/Counter-Defendant Williams, an individual, is a citizen of the State of Illinois.

7.      On information and belief, Third Party Defendant UrthCom is an Illinois Limited Liability Company formed on April 23, 2008 in the State of Illinois.  Upon further information and belief, at all times relevant to this Counterclaim, UrthCom was and is a mere sham and shell

organized and operated as the alter ego of Counter-Defendant Williams for his sole benefit and advantage.

8.    On information and belief, Third Party Defendant Ceko, an individual, is a citizen of the State of Illinois.  Mr. Ceko is a shareholder in SCB and was, until June 20, 2008, a Director of SCB.  On information and belief, Mr. Ceko is the brother-in-law of Plaintiff/Counter-Defendant Williams.

9.    On information and belief, Third Party Defendant Cekom is an Illinois corporation formed in 1992, with a principal place of business at 457 Oak Knoll Road, Barrington, Illinois 60010.  Upon further information and belief, at all times relevant to this Counterclaim, Cekom was and is a mere sham and shell organized and operated as the alter ego of Ceko for his sole benefit and advantage.

## Facts Relevant to All of SCB's Claims For Relief

10.    SCB was founded in 1999 by a small group of friends and family, in order to build a business around a unique baseball training tool developed by SCB founder Robert "Bob" Moss ("Bob Moss").  During his years of teaching and coaching at the Pee-Wee and Little League levels of baseball, Bob Moss was made aware of the limited benefits and significant shortcomings of the ubiquitous static batting tee training tool ("Tee-Ball") used for decades. Intent on creating a totally new training tool that would improve on the Tee-Ball and help young hitters to develop proper hand-eye coordination and transition fully towards hitting a moving ball, Bob Moss invented a new kind of pitching machine known as the "GAP Hitter."  The GAP Hitter is a pendulum-action baseball training device that can be used by amateur and professional baseball players of all ages to practice and perfect their swings.

11.    Today SCB is under the leadership of Bob Moss' son, Robert A. Moss, Jr. ("Rob Moss"), the current President of SCB.  In mid-2007, in order to increase sales, Rob Moss began

to investigate developing a marketing campaign for the GAP Hitter, to include launch of a GAP Hitter-themed e-commerce website, two short commercials, an instructional DVD, and a long-form direct response broadcast television program, or "infomercial."

12.    On or about August 27, 2007, Rob Moss was introduced to Williams by Ceko, Williams' brother-in-law.  Ceko recommended to Rob Moss and other executives of SCB that SCB retain Williams (doing business at that time under the assumed name "Xtra Strength") to provide production and other services related to the planned GAP Hitter marketing campaign. Ceko represented to Moss and SCB that Williams had extensive experience in marketing in general, and direct response marketing in particular, and claimed that Williams had previously created a professional infomercial for the popular "Bowflex" product.  SCB thus commenced negotiations with Williams.

13.    During these negotiations, Williams similarly stressed his expertise in the field of direct response marketing.  Williams expressly represented to SCB that he and his company had worked on numerous direct response projects.  Williams assured SCB that based on his vast experience in the field, "Xtra Strength" was capable of delivering a professional long-form "infomercial" marketing piece for broadcast on television networks nationwide (the "Infomercial").  Williams also told SCB that his company could produce a better quality product than any of the other companies that SCB was considering, at a lower cost.

### The Letter of Agreement & SCB's Payments

14.    Based on the express representations of Williams and Ceko as to Williams' prior experience, abilities, qualifications, and expertise, SCB elected to move ahead with Williams. When it came time to put the parties' agreement into writing, Williams explained that "Xtra Strength" was his marketing company, and that he had a separate production company, "UrthCom, LLC," through which he intended to provide direct television/infomercial production

and marketing services to SCB.  SCB thus entered into a letter of agreement with "UrthCom, LLC" dated September 5, 2007 and executed by SCB on or about September 21, 2007 (the "LOA").  A true and correct copy of the LOA is attached hereto as Exhibit 1.

15.     On or about September 7, 2007, and pursuant to the terms of the LOA, SCB made an initial wire transfer payment of $67,150 to a numbered account at JP Morgan Chase bank provided by Stephanie Wysocki, formerly known as Stephanie Rice ("Wysocki") at Xtra Strength.  The account was held in the name of Cekom, which—unknown to SCB at that time— is controlled by Ceko.  This initial payment was made by SCB in good faith, even though the LOA had not yet been finalized and executed, so that Williams might begin production of the GAP Hitter Infomercial.

16.     In addition to the initial payment of $67,150, SCB expended additional amounts for inventory, travel, and related costs in order to facilitate creation of the Infomercial, both to "UrthCom, LLC" directly, and to various third parties.  SCB also provided monetary and other valuable compensation to obtain endorsements for the Infomercial, including from legendary Hall-of-Fame baseball player Rod Carew.

**Misrepresentations & Fraudulent Omissions**

17.     Unbeknownst to SCB, many of the representations made by Williams and Ceko to convince SCB to execute the LOA were false, deceptive, and fraudulent.  For example, although Williams held "UrthCom, LLC" out as a legitimate business entity, as of the date of the LOA, "UrthCom, LLC" was a fiction and did not exist as a legal entity recognized by Illinois or any other state.   Furthermore, upon information and belief, Williams and "UrthCom, LLC" lacked the claimed experience in the realm of direct television marketing and infomercials.  These and other misrepresentations were made with the express intent to induce SCB into entering into a contract with "UrthCom, LLC," and in furtherance of an agreement to defraud SCB.

18.     Further unbeknownst to SCB, Ceko had an undisclosed financial interest in "UrthCom, LLC," either personally or through his alter-ego, Cekom.  On information and belief, Ceko is the President, Secretary and agent for service of process of Cekom.  At Ceko's instruction, the initial payment made by SCB under the LOA was directed not to "Xtra Strength" or "UrthCom, LLC," but rather to an account at JP Morgan Chase (Acct. No. 2664232) held in the name of Cekom.  "UrthCom, LLC" continued to invoice SCB using the Cekom account number—all with Ceko's knowledge and approval—throughout the remainder of 2007 and into 2008, even after the SCB Board of Directors had discussed that there were issues with the deliverables provided by Williams.  Ceko did not admit that SCB's payments under the LOA had been transferred into an account he controlled until finally confronted by SCB in February, 2008.  If Ceko's financial interest in "UrthCom, LLC" had been known to SCB at the outset of its negotiations with Williams, SCB likely would not have entered into the LOA.  At a minimum, SCB would have conducted further investigation into the qualifications and experience of Williams and "Xtra Strength"/"UrthCom, LLC."

19.     Having no experience in direct response marketing, and in light of the advice and recommendation of its Director Ceko (who intentionally failed to disclose his financial interest in "UrthCom, LLC"), SCB relied on the false and misleading representations of Williams, UrthCom, Ceko and Cekom and thus reposed SCB's entire confidence and trust in the abilities and experience of Williams and "UrthCom, LLC."

20.     The attempts by Williams, UrthCom, Ceko and Cekom to bilk SCB for as much money as possible did not end with the misrepresentations of Williams' experience, or even with the failure to disclose Ceko's financial interest in "UrthCom."  Rather, Williams and his alter-ego "UrthCom, LLC" knowingly submitted false invoices for payment to SCB which included

overcharges for services actually performed; fraudulent charges for other items and services either not actually performed, or else not part of the parties' agreement and not otherwise approved or authorized; and charges for items and services which Williams and UrthCom knowingly and intentionally deceived SCB into believing were being offered on a free or complimentary basis, in order to induce SCB into agreeing to them.

21.     For example, during shooting of the Infomercial, Wysocki, an agent of "UrthCom, LLC" and employee of Williams, requested approval from SCB for a podcasting budget.  SCB President Rob Moss expressly disapproved the request.  Nonetheless, Invoice No. 12310701 (a true and correct copy of which is attached hereto as Exhibit 2) includes a purported charge to SCB of $1,000 for "Podcast Recording."  In addition to this completely unauthorized charge, the same Invoice No. 1231071 includes inappropriate double charges to SCB for items that were already included in the contract price set forth in the LOA (*e.g.*, for "Stadium Food," "GAP Hitter Landing Page," etc.), as well as charges over and above the work actually done (*e.g.*, "Talent").

22.     As another example, on or about September 14, 2007, Wysocki—acting as an agent and employee of "UrthCom, LLC" and/or Williams—offered to drive two SCB executives from Chicago, Illinois to New Berlin, Wisconsin for a meeting with the fulfillment group for the GAP Hitter product.  The SCB executives had already rented a car for the short (approximately 90-minute) drive, but Wysocki was persistent in her offer, and repeatedly expressed that it was "no problem" for her to drive the executives in her own car.  Believing based on Wysocki's representations that her offer was being made as part of the package of turn-key client services supposedly included in the contract price, the SCB executives accepted the ride, and even picked up the tab for Wysocki's lunch on their return trip.  No mention was ever made of the fact that

SCB would incur additional charges (*i.e.,* over and above the contract fees) for Wysocki's time, but Invoice No. 10010701 (a true and correct copy of which is attached hereto as Exhibit 3) from "UrthCom" includes a purported charge of $1,000 for "Fulfillment Group Meeting"—a hefty amount for what was, in essence, an unrequested and unnecessary chauffeur service by Wysocki. Following complaint by SCB about the "Fulfillment Group Meeting" charge and other questionable and/or unauthorized charges included in Invoice No. 10010701, "UrthCom" later submitted a replacement invoice that had been "reduced to cover hard costs." A true and correct copy of that invoice and a related cover email is attached hereto as Exhibit 4.

### Delays & Delivery of the Deficient Infomercial

23.     Williams and "UrthCom, LLC" failed to meet each and every agreed-upon delivery deadline set by the LOA and the agreement of the parties. The net result of such delay was that SCB missed the intended first-quarter 2008 rollout for the Infomercial. The first quarter of each calendar year is always the strongest sales period for direct response television campaigns, and thus the delay in roll-out of the Infomercial caused direct damage to SCB in the form of missed opportunities and lost sales.

24.     When Williams and company finally did deliver the Infomercial, SCB learned to its dismay that the final product was woefully deficient in a number of important ways. Due to the relatively high rates quoted, and lack of experience of the media team selected, by Williams and/or UrthCom, SCB advised "UrthCom, LLC" in or about January, 2008, that SCB would conduct media testing on its own. SCB therefore forwarded the mastered version of the Infomercial to its media vendors for review on the Infomercial's compliance with broadcast standards, only to be informed that the finished Infomercial contained formatting and content deficiencies so severe that no network would, or legally could, broadcast it. In addition to the failure to meet basic legal requirements, the Infomercial produced by Williams and "UrthCom,

LLC" lacks standard marketing messages that are commonly understood among legitimate members of the direct response industry to be virtual prerequisites to any successful piece. In short, the Infomercial is completely useless.

25.     Upon information and belief, neither Williams nor any employee of the entity holding itself out as "UrthCom, LLC" had ever had primary responsibility for the creation of a direct response marketing piece at the time the LOA was executed.

26.     Upon information and belief, neither Williams nor any other employee of the entity holding itself out as "UrthCom, LLC" had ever had primary responsibility for the creation of a direct response marketing piece for the popular "Bowflex" product at the time the LOA was executed.

27.     Upon information and belief, "Bosco Productions," the production company selected by Williams and/or UrthCom to produce the Infomercial, had not previously produced a similar long-form infomercial at the time the LOA was executed.  On further information and belief, Williams, UrthCom, Ceko and Cekom knew this when selecting and/or recommending Bosco Productions to produce the Infomercial.

28.     SCB's media vendors have provided consistent feedback as to the key areas of deficiency of the Infomercial.  For example, the following represents a non-exhaustive list of the problems and deficiencies in the Infomercial:

- Hosts are not introduced;
- Lack of the typical, proven industry-standard format of three "pods" with calls-to-action between each pod;
- Continuous display of the sales telephone number and the URL of SCB's website, undermining the effectiveness of the calls-to-action;
- No closed-captioning;
- Required legal disclosures are unusually worded and, in some cases, missing altogether;

- Calls-to-action are not properly mastered for insertion of editable information, which is critical for testing purposes, as well as roll-out trackability to regional markets;
- Lack of focused and tenacious selling and little sense of urgency;
- Lack of other typical, industry-standard selling tactics, *i.e.*, no clear exposition of the "common problem" faced by potential product customers, the deficiencies of competitive products, the unique and easy solution offered by the GAP Hitter, or the substantial value of the product offer.

29.     Once it became apparent to SCB that there was an issue with the deliverables provided by Williams and UrthCom, SCB's executives notified the SCB Board of Directors (the "Board"), including Ceko.  In response, Ceko worked at cross-purposes to SCB, urging SCB to simply accept the deficient Infomercial and settle its disputes with Williams and UrthCom, rather than insist on its contractual rights.  Ceko argued that the Infomercial would "never be perfect and management should not try to tweak it too much."   Ceko further urged the Board to let him serve as the primary liaison between SCB and Williams/UrthCom.  On information and belief, Ceko shared confidential SCB information—that he only had access to as a result of his position as an SCB Board member—with Williams, UrthCom, and Cekom.

**Ongoing Damage to SCB**

30.     Because it could not make use of the Infomercial as intended, SCB was forced to hire a new consultant and production team to help produce and test a short-form campaign as a "stop-gap" measure to avoid further damage.  SCB has already spent more than $35,000 in new production costs in an effort to mitigate its damage, and that number will only grow.  SCB has further accumulated expenses related to warehousing fees for excess inventory due to the delay in the GAP Hitter television campaign.  But the damage to SCB in lost sales goes beyond these outlays of additional money—SCB has been thus far deprived of the opportunity to market the GAP Hitter via the Infomercial during the peak of the 2008 baseball season.  The real and actual

17

damage to SCB only increases each day that it does not have a direct response marketing piece on the air.

31.     In addition to the deficient Infomercial, Williams and UrthCom have failed to provide the remaining deliverables under the LOA, namely acceptable short-form television commercials or the GAP Hitter instructional DVD.  The instructional DVD was intended to be used both as a bonus item for consumers purchasing through the Infomercial, as well as a stand-alone product to generate its own sales revenue.  Moreover, although Williams/UrthCom did initially develop a GAP Hitter-themed website for SCB's use in accordance with the LOA, they later demanded that SCB take the site down, and SCB complied.  SCB has since incurred even more expenses launching a temporary site to salvage at least some of its GAP Hitter sales while it works to develop a replacement marketing campaign.

32.     Rather than assist SCB to mitigate its damages resulting from the deficient Infomercial and missing deliverables under the LOA, Ceko again worked at cross-purposes to SCB.  Ceko criticized the proposed short-form replacement video, claiming that he would be embarrassed to show it to investors.  Furthermore, each time Ceko was questioned by the SCB Board or its executives about his relationship with Williams and UrthCom and his apparent conflict of interest, he attempted to divert attention from these issues by creating others— criticizing and challenging management and making unreasonable and unnecessary demands for documentation and other information to SCB's corporate counsel.  On information and belief, all such challenges and demands by Ceko were made in bad faith solely to cause confusion, mistrust, and delay in furtherance of Ceko's conspiracy with Williams, UrthCom, and Cekom, and not for any proper purpose.  Ceko's actions wasted the time of SCB's Board and

management, and directly caused additional harm to SCB as a result of legal fees and other expenses incurred in responding to each unreasonable, bad faith request.

<u>**Count I**</u>

**Breach of Contract**

33.    SCB restates and realleges each of the allegations set forth in paragraphs 1 through 32 as if set forth fully in this Count.

34.    Per the terms of the LOA, Williams was obligated to develop and produce a professional "Infomercial" for nationwide broadcast marketing of SCB's GAP Hitter product, two short-form television commercials, an instructional DVD, and an e-commerce website. The production services enumerated in the LOA included all aspects of production; SCB's only contribution to the Infomercial was to be supply of the featured product itself.

35.    Notwithstanding the contractual terms set forth in the immediately preceding paragraph, Williams knowingly and willfully violated the terms of the LOA, by either failing to deliver the products and services agreed upon, or else by providing deliverables so seriously deficient as to be completely unusable by SCB.

36.    The actions and omissions of Williams constitute a breach of his contractual obligations to SCB as stated in the LOA, causing SCB to suffer financial and other damage in an amount to be proven at trial. SCB met each of its obligations under the LOA, or else was excused from performing them following Williams' breach.

37.    Per the terms of the LOA, SCB is entitled to an award of all of its reasonable attorney fees, costs and expenses incurred as result of bringing this claim.

## Count II

### Fraud in the Inducement

38.     SCB restates and realleges each of the allegations set forth in paragraphs 1 through 37 as if set forth fully in this Count.

39.     During negotiation of the LOA, Williams and/or his agents made the false and misleading representations and omissions set forth above.  These representations and omissions were made with the intent to deceive SCB and for the purpose of inducing SCB into executing the LOA, and with full knowledge that they were untrue and/or likely to mislead SCB.

40.     SCB executed the LOA in reliance on the fraudulent misrepresentations and omissions of Williams and his agents as set forth herein.   SCB's reliance on these misrepresentations and omissions was reasonable under the circumstances.  At the time the representations and statements described herein were made to SCB, SCB believed that they were true and had no reason to believe that they were false.  Had SCB known the true nature of "UrthCom, LLC's" business, Williams' (lack of) experience, and Ceko's financial interest in "UrthCom, LLC" and Cekom, SCB never would have executed the LOA or paid any sum at all to any of Williams, UrthCom, Ceko, or Cekom.

41.     As a direct and proximate result of Williams' conduct, SCB has suffered, is suffering and will continue to suffer financial and other damage in an amount to be proven at trial.

42.     In doing the things alleged in this Counterclaim, Williams acted deliberately, wantonly, recklessly, and maliciously.  As a result, SCB is entitled to an award of punitive damages, in addition to its actual damages.

**Count III**

**Violation of 815 ILCS 510/1 *et seq*.**

43.    SCB restates and realleges each of the allegations set forth in paragraphs 1 through 42 as if set forth fully in this Count.

44.    Williams, by the reason of the foregoing acts, has engaged in unfair and/or deceptive acts or practices in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq*.

45.    As a direct and proximate result of Williams' conduct, SCB has suffered, is suffering and will continue to suffer financial and other damage in an amount to be proven at trial.

**Count IV**

**Civil Conspiracy**

46.    SCB restates and realleges each of the allegations set forth in paragraphs 1 through 45 as if set forth fully in this Count.

47.    Prior to the time that SCB executed the LOA, on information and belief, Williams,  along with UrthCom, Ceko and Cekom, conspired to mislead and deceive SCB with respect to the success and experience of Williams and "UrthCom, LLC" in the field of direct response marketing, and conspired to engage in other unlawful, unfair and deceptive acts, all in order to induce SCB to enter into an contract which SCB otherwise would not have agreed to.

48.    On information and belief, Williams, UrthCom, Ceko and Cekom secretly understood and agreed that it would be represented to SCB that Williams had more experience than he actually did, and/or that Williams possessed qualifications and expertise he did not actually possess.  Williams, UrthCom, Ceko and Cekom secretly understood and agreed that, in addition to the fees set forth in the LOA, Williams and UrthCom would invoice SCB for

additional improper amounts, and Ceko would use his position as an SCB Board member to convince SCB to pay all contract and invoiced amounts without protest into the account of Cekom, regardless of SCB's contractual rights or its best interests.

49.    Williams, UrthCom, Ceko and Cekom each took overt, unlawful actions in furtherance of the conspiracy, including by making fraudulent and/or deceptive representations and statements to SCB, and intentionally concealing Ceko's true financial interests in and to UrthCom and Cekom.

50.    As a result of these wrongful acts, SCB has been damaged and has suffered lost sales, lost opportunities, and additional expenses, all in an amount to be proven at trial.

51.    In doing the things alleged in this Counterclaim, Williams acted deliberately, wantonly, recklessly, and maliciously.  As a result, SCB is entitled to an award of punitive damages, in addition to its actual damages.

### SCB's Prayer for Relief

WHEREFORE, SCB respectfully requests that this Court enter judgment against Williams as follows:

1.    Awarding SCB all actual damages sustained by reason of the acts alleged herein by Williams, including interest thereon at the maximum rate permitted by law;

2.    Awarding SCB all profits realized by Williams by reason of the acts alleged herein, including interest thereon at the maximum rate permitted by law;

3.    Awarding SCB increased damages and/or punitive damages as allowed by law in an amount sufficient to punish Williams, and deter others;

4.    Awarding SCB its costs, disbursements and reasonable attorneys' fees as recoverable by contract and/or as permitted by law; and

5.  Awarding SCB such other and further relief as this Court may deem just and

equitable.

## **Jury Trial Demand**

SCB demands a trial by jury on all claims as to which jury trial may be had.




Respectfully submitted,


_____s/ Jami A. Gekas_____
One of the Attorneys for Defendant,
SOLID CONTACT BASEBALL, INC.

Dated:  July 18, 2008

Michael Dockterman
Jami A. Gekas
WILDMAN, HARROLD, ALLEN & DIXON LLP
225 West Wacker Drive
Chicago, IL  60606-1229
(312) 201-2000
Facsimile:  (312) 201-2555

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that a copy of the foregoing FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM was served via the CM/ECF electronic filing system on this 18th day of July, 2008, and thereby served upon counsel of record.

By: s/ Jami A. Gekas_____

One of the Attorneys for Defendant,
SOLID CONTACT BASEBALL, INC.

# Exhibit 1



## LIST OF AGENCY SERVICES AND FEES

This LETTER OF AGREEMENT is entered into by and between UrthCom, LLC, an Illinois Corporation ("Agency") and Solid Contact Baseball, Inc. a Connecticut Corporation ("Client"), effective Sept 5, 2007.

AGENCY SERVICES
Agency agrees to act as the "Advertising and Marketing Agency of Record" for the Client under the terms of this agreement. The following is a list of the services that the Agency will provide to the client.

> Design/Creative
> Agency will develop and implement the Client's creative/design related to advertising, marketing and/or promotion. Items to be included:
> - The Gap Hitter Infomercial Production – 30 Minute, 2 Minute, 1 Minute
> - The Gap Hitter Instructional DVD Production
> - Media Scheduling for Test
> - Website Development
>
> Costs are based on a two day shoot on-location in the Chicago area. Props and Gap Hitter equipment to be provided by Solid Contact Baseball.
>
> Production costs are budgeted to include: storyboard development, script writing, location scouting, casting, director of photography, camera, grip and sound packages, makeup, wardrobe, production assistant, producer, extra grips, editing, graphics, voice-overs, and music.
>
> Media Schedule budget is based on quote provided ($13,400) to target key cable sports networks in Midwest, New England, Southeast, and Southwest. Note: pricing in 3rd and 4th quarter typically increases by 15 - 30%.
>
> Development of interactive website includes HTML and Flash programming, custom, and stock photography, video and audio clips, and integrating e-commerce applications. Site pages will include meta-tagging techniques to increase hits through search engines.

BILLING/TERMS
Total fees for services listed above are $134,300 which are payable with the following schedule:
- Initial payment of $67,150 is due upon signature of Agreement
- Final Payment of $67,150 is due November 1, 2007

Agency invoices using Net 30 terms. A monthly late fee of 1.5% of the invoice will be assessed for overdue payments.

MARK-UPS AND OUT-OF-POCKET EXPENSES
Agency's out-of-pocket expenses are subject to a handling charge of 15% (agency standard ranges from 18 – 30%) The proposal/retainer does not include costs such as photography & illustration, scanning, film separations, and photo manipulation/retouching. It also does not include costs for presentation materials, such as color fiery proofs and presentation boards.

JOB ESTIMATES
Agency agrees to provide the Client with job estimates prior to starting every project/campaign. Client approval of the estimate is the Agency's authorization to proceed with the project/campaign.

SHIPPING
Shipping and/or messenger charges are not included and will be billed at invoiced amount.

CHANGE ORDERS
Change orders will be issued for individual project components is the work requested by the client falls outside of the scope of previous agreements and allotted rounds of refinements. Verbal approval will be sufficient to keep the project component active. However, Agency reserves the rights to stop work on the additional assignment unless written authorization from Client is received within 5 working days of its submission.

CHANGE FEES
Agency reserves the right to submit additional invoices for professional fees and out-of-pocket fees, which are the result of any of the following changes in the scope or direction of the project: a change in senior management, increase in the scope of agreed upon activities, a change in client business strategy which causes a change in the direction of the project, an increase in scope of any agreed upon work activities, new deliverables not included in the proposal or changes to the positioning direction after sign off. Change fees will be discussed with Client prior to additional work beyond the scope outlined in this proposal being performed.

TAXES
Any withholding, value-added, or similar tax will be the responsibility of and shall be paid by Client. In the event Agency pays such tax, Client shall immediately reimburse Agency.

TRAVEL
Travel costs are billed at our costs and will be invoiced separately each month.

INDEMNIFICATION
The designs, marks, and materials created by Agency are believed not to infringe upon the rights of others. It is ultimately the responsibility of Client to institute a legal trademark search for all name and logo design choices (availability, registerablility), and Agency is free of any liability in this search. Any materials or images furnished to Agency by Client must be free and clear of any copyright or trademark problems. Client alone is liable if it fails to obtain correct usage rights. If any false statements or plagiarism occurs within copy or materials applied to Agency by Client or its agency, Client will be held responsible for any legal repercussions and accepts all liability.

SCOPE
Should guidelines by Client may be changed due to the results of consumer research, competitive action or other factors while the project is underway, Agency will modify and resubmit new cost estimates.

LIABILITY
Agency is responsible only for corrections directed by client. The ultimate proofing responsibility for all copy rests with client, included final printers' proofs at blueline state. Note: One Client signs Agency's final proof (fiery, laser, etc) as an O.K. to send artwork to any vendor (printing, engraving, etc) any additional changes that are requested by the client will incur charges for the printer's costs and for Agency's cost. These costs will be estimated separately.

SECURITY
Every effort will be made to maintain the strictest confidence concerning any material, plans, or policies divulged to us in the course of Agency's relations with Client.

DESIGN RIGHTS
The design, name, mark or other material in final form that is approved by client and selected for its use will be the exclusive property of client, upon full payment of services. All other designs and materials developed in the course of the design project shall remain property of Agency, as is common in the profession. Client's ownership of legal rights in the final form of the item it selected is exclusive to the market territory identified in the project brief and to the extent provided by applicable national laws and treaties. Client's use of the final artwork or designs, in market territories other than that market territory identified in the project brief, shall require Client's prior notification of and consent by Agency. Where applicable, legal protection and appropriate registration of a design, name mark or other material developed by Agency is Client's sole responsibility and should be done promptly after final approval to preserve such rights.

## OTHER

Throughout the life of this agreement between the Agency and the Client, there may be other business opportunities that arise. Agency and Client agree that this Letter of Agreement may be amended from time to time to include other services as long as both Agency and Client agree to the terms.

## ATTORNEY FEES

In any litigation, arbitration, or other proceeding by which one party either seeks to enforce its rights under this Agreement (whether in contract, tort, or both) or seeks a declaration of any rights or obligations under this Agreement, the prevailing party shall be awarded its reasonable attorney fees, and costs and expenses incurred.

## SIGNATURES

Each person signing this Agreement represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Agreement. Each party represents and warrants to the other that the execution an delivery of the Agreement and the performance of such party's obligations hereunder have been duly authorized and that the Agreement is a valid and legal agreement binding on such party and enforceable in accordance with its terms.

UrthCom, LLC
an Illinois Company

By: Donald Williams
Title: President

Solid Contact Baseball, Inc
a Connecticut Company

By: Robert A. Moss, Jr
Title: President

# Exhibit 2



# Invoice

| Attention: | Robert A. Moss, Jr. | Project Title: | Solid Contact Baseball |
| --- | --- | --- | --- |
| Title: | President | Project Description: | Balance and additional items |
| Company Name: | Solid Contact Baseball, Inc | P.O. Number: | |
| Address: | 16 Forest Street | Invoice Number: | 12310701 |
| City, State Zip Code: | New Canaan, CT 06840 | Term: | 30 Days |
| Date: | 12/31/07 | | |

| Description | Quantity | Unit Price | Cost |
| --- | --- | --- | --- |
| November Final Payment | | | $67,150.00 |
| September Invoice | | | $5,246.00 |
| Shipping - Sport Shake samples | | | $125.40 |
| Alexian Field Rental (2 day) | | | $4,500.00 |
| Talent | | | $5,400.00 |
| Stadium Food (2 day) | | | $1,850.00 |
| Baseball hats (12) for shoot | | | $156.96 |
| Podcast Recording | | | $1,000.00 |
| Weekend Recording Session (V.O) | | | $3,200.00 |
| GAP Hitter Landing Page w/video | | | $1,200.00 |
| Parking | | | $112.00 |
| Cab Fares | | | $96.00 |
| Kinkos | | | $176.14 |

This invoice does not include cost increase for media test budget.     **Total     $90,212.50**
Any increase will be determined once media schedule is confirmed.

Please remit payment via electronic transfer:

Bank - JP Morgan Chase
ABA# - 021 000 021
Account # - 2664232
Account Name - Cekom

**212 West Kinzie Street - Fourth Floor, Chicago, IL 60610**
**312-245-2850 www.urthcom.com**

# Exhibit 3



**Rob Moss <robertamoss@gmail.com>**

# (no subject)

**Stephanie Wysocki <swysocki@urthcom.com>**                     **Fri, Oct 12, 2007 at 12:38 PM**
To: "Rob Moss Jr." <rob@solidcontactbaseball.com>

Hi Rob -

I'm glad we connected this morning.  I think the coaches section of the website is going to be a really great
tool.  I'll be working on this over the weekend --- please send over any forms or skeleton concepts you and
Chris have.

As I mentioned, attached is an invoice for September.  Please do not hesitate to call me with any questions or
concerns you may have.

All the best,
Stephanie

 **SCB**
295K

# Invoice



| | | | |
|---|---|---|---|
| **Attention:** | Robert A. Moss, Jr. | **Project Title:** | Solid Contact Baseball |
| **Title:** | President | **Project Description:** | September - Additional Projects |
| **Company Name:** | Solid Contact Baseball, Inc | **P.O. Number:** | |
| **Address:** | 16 Forest Street | **Invoice Number:** | 10010701 |
| **City, State Zip Code:** | New Canaan, CT 06840 | **Term:** | 30 Days |
| **Date:** | | | |

| Job Number | Description | Quantity | Unit Price | Cost |
|---|---|---|---|---|
| | Roundtrip Airfare (OC Trip) | | | $393.00 |
| | Hours (OC Trip) | 9.5 | $125.00 | $1,187.50 |
| | Parking (OC Trip) | | | $50.00 |
| | Investor Presentation (Sept 13) | 16 | $125.00 | $2,000.00 |
| | Parking (Sept 13) | 2 | $14.00 | $28.00 |
| | Fulfillment Group Meeting (Sept 14) | 8 | $125.00 | $1,000.00 |
| SCB-082401 | Logo Design & Development | | | $2,500.00 |
| SCB-082402 | On-site photography | | | $2,200.00 |
| | | | Subtotal | $9,358.50 |
| | | Tax | | $0.00 |
| | | | **Total** | **$9,358.50** |

**212 West Kinzie Street - Fourth Floor, Chicago, IL 60610**
**312-245-2850 www.urthcom.com**

# Exhibit 4



**Rob Moss <robertamoss@gmail.com>**

# Revised Invoice

**Stephanie Wysocki <swysocki@urthcom.com>**                    Fri, Oct 12, 2007 at 4:51 PM
To: "Rob Moss Jr." <rob@solidcontactbaseball.com>
Cc: dwilliams@urthcom.com, Pete Ceko <Peter.ceko@mam.bm>

Hi Rob -

Please find attached revised invoice for the September projects.  Several of the elements have been reduced
to cover hard costs.

If you have any questions, please don't hesitate to give us a ring.

All the best,
Stephanie

 **SCB**
295K



# Invoice

| | | | |
|---|---|---|---|
| **Attention:** | Robert A. Moss, Jr. | **Project Title:** | Solid Contact Baseball |
| **Title:** | President | **Project Description:** | REVISED September - Additional Projects |
| **Company Name:** | Solid Contact Baseball, Inc | **P.O. Number:** | |
| **Address:** | 16 Forest Street | **Invoice Number:** | 10010701 |
| **City, State Zip Code:** | New Canaan, CT 06840 | **Term:** | 30 Days |
| **Date:** | | | |

| Job Number | Description | Quantity | Unit Price | Cost |
|---|---|---|---|---|
| | Roundtrip Airfare (OC Trip) | | | $393.00 |
| | Hours (OC Trip) | 9.5 | $50.00 | $475.00 |
| | Parking (OC Trip) | | | $50.00 |
| | Investor Presentation (Sept 13) | 6 | $50.00 | $300.00 |
| | Parking (Sept 13) | 2 | $14.00 | $28.00 |
| | Fulfillment Group Meeting (Sept 14) | 8 | $50.00 | $400.00 |
| SCB-082401 | Logo Design & Development | | | $1,600.00 |
| SCB-082402 | On-site photography | | | $2,000.00 |
| | | | Subtotal | $5,246.00 |
| | | Tax | | $0.00 |
| | | | **Total** | **$5,246.00** |

**212 West Kinzie Street - Fourth Floor, Chicago, IL 60610**
**312-245-2850 www.urthcom.com**